UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELEMENTAL RESEARCH INC., <br><br> Plaintiff, <br><br> v. <br><br> JASON BRUNSON, <br><br> Defendant. | Case No. 2:24-cv-00128-AKB <br><br> **MEMORANDUM DECISION AND ORDER** |

Pending before the court is Defendant Jason Brunson's Motion to Dismiss for Failure to State a Claim (Dkt. 14) and Plaintiff Elemental Research Inc.'s Motion to Strike (Dkt. 17).

## I. BACKGROUND

Plaintiff Elemental Research Inc. (Elemental) alleges the following facts in its Amended Complaint (Dkt. 8). Elemental is an Idaho company that sells mineral supplement products, including bottles of water with suspended mineral particulates and topical sprays with similar contents (*id.* at ¶¶ 1, 6-7). Elemental believes that it is the first company to develop and sell these products, as it entered this market in 2003 (*id.* at ¶¶ 8-9).

Since it entered this market, Elemental has used the phrase "Angstrom Minerals" on or with its products and refers to this phrase as its word mark (*id.* at ¶ 10). For about the same period of time, Elemental has used an uncommon unit of scientific measurement denoting one ten-billionth of a meter—an Angstrom (named after Swedish physicist Anders Ångström and represented by the letter "Å") which is not used in the English alphabet but is part of the

Scandinavian alphabet—with its products (*id.* at ¶ 14) (logo). Elemental has used this phrase and logo since 2003 and believes it is the only company to do so until present day (*id.* at ¶ 15). "Angstrom Minerals" and the stylized, encircled "Å" are featured in Elemental's advertisements and on Elemental's website and products (*id.* at ¶¶ 18-20). Elemental's aqueous mineral suspensions have maintained the same packing and labeling between each of these products, as described in the Amended Complaint (*id.* at ¶ 8) (trade dress).

Elemental and Brunson entered into an oral distribution agreement on or about January 1, 2008, in Kootenai County, Idaho (Distribution Agreement) in which Brunson would purchase Elemental's products at a discounted price and resell them on Brunson's own websites (*id.* at ¶¶ 28-31). Elemental produced these products, which are labeled with Elemental's claimed word mark, logo, and trade dress (*id.* at ¶ 32). These labels were created for Brunson's use (*id.*). As part of the Distribution Agreement, Brunson received permission to use the word mark, logo, and trade dress exclusively to advertise and sell products purchased from Elemental (*id.* at ¶ 34). The Distribution Agreement provided Elemental sole discretion to control the conditions and terms of Brunson's use of Elemental's word mark, logo, and trade dress (*id.* at ¶ 37). The agreement was terminable by either party at will (*id.* at ¶ 38).

During the period in which the Distribution Agreement was in effect, Brunson advertised and sold Elemental's products on various websites, including "angstrom-mineral.com," "angstrom-minerals.com," and "healthshop101.com" (*id.* at ¶ 39). In or about the spring of 2012, Elemental and Brunson entered negotiations for the sale of several assets, including the word mark, logo, and trade dress (*id.* at ¶ 41). Brunson agreed in writing not to use any of the information that he acquired during these negotiations in any way detrimental to Elemental and promised to

maintain the confidentiality of any and all acquired information (*id.* at ¶¶ 42-44). During negotiations, Brunson learned several confidential pieces of information about Elemental's operations, including the identities of Elemental's suppliers (*id.* at ¶ 45). Brunson did not purchase Elemental's assets but did continue to purchase products from Elemental under the Distribution Agreement (*id.* at ¶ 46).

Elemental and Brunson encountered disputes in early 2022 regarding the Distribution Agreement; Brunson stopped purchasing products from Elemental but continued to sell or otherwise dispose of existing product inventory (*id.* at ¶¶ 49-51). At some point, after disposing of the products he had purchased from Elemental, Brunson allegedly used confidential information acquired from the asset sale negotiations to begin manufacturing or sourcing products that contained aqueous suspensions of the same minerals in the same concentrations as the products Elemental sold (*id.* at ¶¶ 52-54).

Brunson subsequently produced goods with labels resembling the labels Elemental uses on its products (*id.* at ¶ 55). The labels use the same colors for the same products and have a very similar layout and use similar language (*id.*). Brunson's product label has a different logo, which is the letters "AM" in a rectangular box (Dkt. 14 at 9). For convenience, the Court refers to Brunson's later-produced set of products as the "AM Products."

At some point between the middle of 2022 to January 2023, Brunson began to advertise and sell AM Products on his websites (Dkt. 8 at ¶ 56). In January 2023, Brunson notified consumers that "we have a new Logo and Product Labels" and that the AM Products were the "[s]ame great product, just a different name" (*id.* at ¶ 57). Brunson's packing receipts contained Elemental's word mark and logo and were sent to consumers when they purchased Brunson's

products (*id.* at ¶ 60). Brunson also continued to use Elemental's word mark and logo on his websites and his advertisements (*id.* at ¶ 61).

On May 24, 2023, Elemental formally revoked all rights given to Brunson regarding the use of Elemental's word mark, logo, or trade dress and terminated the Distribution Agreement (*id.* at ¶ 62). Brunson continued to use Elemental's word mark, logo, and trade dress to sell his AM Products (*id.* at ¶¶ 63-4). Brunson then began informing customers that one of his websites, "healthshop101.com" is a division of Angstrom Minerals (*id.* at ¶ 65). Following the termination of the Distribution Agreement, Brunson informed customers that there was no change in his AM Products (*id.* at ¶ 66).

Since Brunson began selling and advertising the AM Products, Elemental's customers have contacted Elemental through various channels to both clarify whether the AM Products were Elemental's and to express confusion as to whether or not the AM Products were sourced from Elemental (*id.* at ¶¶ 71-72). Elemental sent a letter to Brunson on October 5, 2023, demanding that he cease and desist all uses of Elemental's word mark, logo, and trade dress (*id.* at ¶ 73). Brunson did not stop its use and began including samples and gifts in his shipments to consumers, which is a practice that Elemental also engages in (*id.* at ¶¶ 74-75).

Following the delivery of the cease-and-desist letter, Elemental launched a new line of products called "MegaX" (*id.* at ¶ 77). Following this release, Brunson launched a new product line called "Xtra" (*id.* at ¶ 78). The labels for the new "MegaX" line use a different color scheme than Elemental's normal labels, and Brunson's "Xtra" line uses a near identical color scheme to Elemental's new line (*id.* at Ex. D).

Elemental sued Brunson, alleging a breach of the Distribution Agreement contract; a breach of the Non-Disclosure Agreement; infringement of its trade dress, word mark, and logo; false designation of affiliation; false designation of origin; and cyberpiracy (*id.* at ¶¶ 80-169). In response, Brunson filed a motion; to dismiss (Dkt. 14). After Elemental responded to this motion, Brunson filed a reply containing Scott Browdy's declaration ("Browdy Declaration") (Dkt. 16-2). Exhibit A to the Browdy Declaration is forty-seven pages and consists of website screenshots of similar products to those of Brunson and Elemental which use the phrase "Angstrom Minerals" to sell and advertise their products (Dkt. 16). Brunson asks the Court to take judicial notice of those websites and the products' descriptions. For a vast majority, however, there is no indication of what website they depict and no complete URL. Instead, the Browdy Declaration identifies Exhibit A as "an index and copy of various companies [sic] Angstrom Mineral products as listed on their respective websites and Amazon." Elemental moves to strike the Browdy Declaration (Dkt. 17).

## II. LEGAL STANDARD

Rule 12(b)(6) of Federal Rules of Civil Procedure permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." To survive such a motion, a complaint must allege facts that, when taken to be true, state a facially plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff's claims are taken as true and construed in the light most favorable to the plaintiff, but conclusory allegations and unwarranted inferences alone are insufficient to defeat a motion to dismiss. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996). Further, a complaint must show "factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct," *Iqbal*, 556 U.S. at

678, and allege "more than labels and conclusions, and a formulaic recitation of the elements." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Whether to convert a motion to dismiss into one for summary judgment is a matter of judicial discretion. *See Burgess v. San Francisco*, Nos. 91-15084 and 91-15493, 1992 WL 26545, at *2 (9th Cir. Feb. 18, 1992); *Adobe Sys. v. Blue Source Grp. Inc.*, 125 F. Supp. 3d 945, 968 (N.D. Cal. 2015). Alternatively, Rule 12(f) of the Federal Rules of Civil Procedure permits that a district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Typically, when deciding whether to exercise discretion in these matters, a court examines whether the parties have had sufficient time to conduct discovery, the completeness and necessity of the evidence proffered, and whether the proffered information should or must be considered at this juncture. *Barnes v. Sea Hawai'i Rafting, LLC*, 493 F. Supp. 3d 972, 976-77 (D. Haw. 2020).

### III. ANALYSIS

**A.    Elemental's Motion to Strike**

Brunson's reply brief attached the Browdy Declaration (Dkt. 16), which depicts several apparent websites that use the phrase "Armstrong Minerals" (Dkt. 16-2). Elemental moves to strike this declaration because it is untimely under District of Idaho Local Civil Rule 7.1(b)(2) (Dkt. 17).

Rule 7.1(b)(2) provides, in pertinent part, that "the moving party must serve and file with the motion affidavits . . . declarations . . . copies of all photographs, documentary evidence and other supporting materials on which the moving party intends to rely." Similarly, Rule 6 of the Federal Rules of Civil Procedure requires that "any affidavit supporting a motion must be served with the motion." Fed. R. Civ. P. 6(c)(2). Where an affidavit supporting a response is untimely, it

may be stricken. *Herrera v. State of Idaho*, No. CV 02-358-S-MHW, 2005 WL 2367540, at *2 (D. Idaho Sept. 27, 2005). Generally, a court will not consider new evidence in a reply without first giving the non-movant an opportunity to respond. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). Courts may consider evidence rebutting arguments raised for the first time in the non-movant's opposition. *Mintun v. Peterson*, No. CV06-447-S-BLW, 2010 WL 1338148, at *27 (D. Idaho Mar. 30, 2010).

Brunson asks the Court to take judicial notice of his late submission; namely, that the websites exist and list the products reflected. He does so because the Browdy Declaration contests Elemental's allegations of exclusivity (Dkt. 18 at 2). Brunson did not argue a lack of exclusivity in his motion to dismiss, however. Rather, Brunson argues that Elemental took the position in its response that its products have acquired secondary meaning (suggesting the products' origin), and that the websites Brunson identifies undercut that argument. That may be, but the Court will not exercise its discretion to convert the motion to dismiss into a summary judgment motion to consider facts beyond the complaint, and it will not take judicial notice as requested because it is not clear the information submitted "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" as Rule 201 of the Federal Rules of Evidence requires for judicial notice. *See* Fed. R. Evid. 201(b)(2). Moreover, the information would not materially change the Court's analysis under the standard governing a motion to dismiss. Because the declaration is untimely and the Court declines to convert the motion to dismiss into a summary judgment motion, the Court grants Elemental's motion to strike the Browdy Declaration.

B.   **Brunson's Motion to Dismiss**

The Amended Complaint alleges eight causes of action against Brunson (Dkt. 8). Brunson addresses each in turn in his motion to dismiss (Dkt. 14).

1.   **Count I: Breach of the Distribution Agreement Contract**

Elemental alleges the parties entered into an oral Distribution Agreement in which Elemental had sole discretion over Brunson's use of its word mark, logo, and trade dress and that Brunson breached the terms of that agreement when he used Elemental's word mark, logo, and trade dress to advertise and sell his products after the agreement ended (Dkt. 8 at ¶¶ 28-34, 82-86, 88-89). According to the Amended Complaint, as part of the Distribution Agreement, Brunson purchased products at a reduced price from Elemental, and then later resold those products at a profit (*id.* at ¶¶ 30-34). Both parties agree Idaho law applies to Elemental's breach of contract claims (Dkt. 14 at 5; Dkt. 15 at 3-4). Brunson asserts the breach of contract claim fails because an oral Distribution Agreement is barred by the statute of frauds, Idaho Code § 28-2-201 (Dkt. 14 at 5-6).[1]

Idaho Code § 28-2-201 requires that, subject to exceptions, contracts for the sale of goods worth $500 or more are only enforceable where they are described by a written instrument that is signed by the party against whom it is to be enforced or that party's agent. Idaho Code § 28-2-

---

[1] Brunson also argues that this claim relies on alleged breaches that occurred after the contract was terminated (Dkt. 14 at 6-7). Elemental's Amended Complaint, however, clearly alleges that Brunson breached the agreement at an unknown point between the middle of 2022 and January 2023, (Dkt. 8 at ¶¶ 56-57), with a specific statement describing the conduct in January 2023 (*id.* at ¶ 57). Meanwhile, the contract was officially terminated on May 24, 2023 (*id.* at ¶ 62). Taking these allegations as true, it allows for an alleged range of approximately three to twelve months where the contract was allegedly in force and Brunson breached the contract. Accordingly, Brunson's argument is rejected.

MEMORANDUM DECISION AND ORDER - 8

201(1) (2025). The statute of frauds defense is an affirmative defense under the Rule 8(c)(1) of the Federal Rules of Civil Procedure.

In a motion to dismiss, a district court can only consider an affirmative defense, including the statute of frauds, where the validity of such a defense is obvious on the face of the complaint. *Richards Indus. Park, Ltd. P'ship v. FDIC*, 572 F. App'x 499, 502 (9th Cir. 2014). Consequently, Brunson's argument that the statute of frauds bars Elemental from bringing suit for a breach of contract only succeeds if the Amended Complaint provides all facts necessary to show that it is within the statute of frauds and provides for no reasonable inference that the claim may meet one of the exceptions provided in Idaho Code § 28-2-201(3).

The statute of frauds provides that contracts which are otherwise unenforceable under the statute are enforceable with respect to goods that have already been produced or received and then accepted. Idaho Code § 28-2-201(3)(c). The Amended Complaint claims that there have been multiple instances in which Brunson purchased and sold goods from Elemental (Dkt. 8 at ¶¶ 30, 46). Taking the allegations as true, the Distribution Agreement was at least partially performed, and therefore the affirmative defense of the statute of frauds is not facially obvious, and the Court denies Brunson's motion to dismiss Count I.

### 2.   Count II: Breach of the Non-Disclosure Agreement Contract

Elemental alleges that Brunson signed a Non-Disclosure Agreement that obligated Brunson to avoid engaging in any conduct detrimental to Elemental (Dkt. 8 at ¶¶ 53-54, 92-99). Brunson argues Elemental failed to allege breach of the contract (Dkt. 14 at 3). The Amended Complaint must show "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, and "more than labels

and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. Under Idaho law, the elements of a breach of contract claim are that a contract between the plaintiff and defendant existed and that while the contract was in force against the defendant, the defendant engaged in conduct that violated the contract and caused damages. *Indep. Sch. Dist. of Boise City v. Harris Family Ltd. P'ship*, 249 P.3d 382, 387 (Idaho 2011).

Elemental attached a copy of the Non-Disclosure Agreement to the Amended Complaint (*id.* at Ex. C). The Amended Complaint then alleges that the contract was breached, stating that Brunson learned information during the pertinent period of time (*id.* at ¶ 45) and used that information to source replacements for Elemental's products (*id.* at ¶¶ 52-54) to Elemental's detriment. Furthermore, the Amended Complaint alleges that Brunson was never released from the NDA. (*id.* at ¶¶ 47-48). Together, these allegations, taken as true, demonstrate that the Brunson engaged in conduct that violated the contract while the contract was still in force against the Brunson. Therefore, the Court denies Brunson's motion to dismiss Count II.

   3.  **Count III: Violation of 15 U.S.C. § 1125(a) Trade Dress Infringement**

Elemental alleges that the labels Brunson used on his aqueous mineral solutions infringed upon Elemental's protectable trade dress under 15 U.S.C. § 1125 (*id.* at ¶¶ 101-111). To state such a claim, Elemental must allege sufficient facts to support reasonable inferences that: (1) the claimed trade dress is nonfunctional; (2) the claimed trade dress identifies the source of the product, either because the claimed trade dress is inherently distinctive or because the claimed trade dress has acquired a secondary meaning; and (3) Brunson's labels create a likelihood of consumer confusion. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir.

2001). Brunson disputes only whether the labels are source identifying or create a likelihood of consumer confusion (Dkt. 14 at 7-9).

### a. Trade Dress as Source Identifying

Where it is reasonable to presume that a consumer will understand product packaging as an identification of the source of the product, the product's packaging may be considered inherently distinctive. *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 212-13 (2000). Consumers are "predisposed" to regard product packaging as an identification of the product's source, so such symbols can "almost *automatically* tell a customer that they refer to a brand." *Id.* (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162-63 (1995)).

The Amended Complaint must allege that a reasonable consumer would understand that the packaging on Elemental's products is designed to indicate that the product's source is Elemental. *Wal-Mart Stores*, 529 U.S. at 212-13. Elemental's labels include Elemental's contact information and words and symbols that Elemental claims to have used exclusively for the last twenty-two years (Dkt. 8 at ¶¶ 10, 14, Ex. B). The Amended Complaint also alleges that these products used these labels for a period prior to the pertinent events (*id.* at ¶ 26). Additionally, the products in question all used very similar labels that only changed slightly from product to product within the product line (*id.* at Ex. D). Together, these facts, taken as true, could lead a reasonable consumer to "almost automatically" conclude that these labels indicated that the products were sourced from Elemental, and the labels, and thus the trade dress, may be found to be inherently distinctive.

Alternatively (and similarly) a trade dress "has acquired distinctiveness . . . if it has developed secondary meaning." *Wal-Mart Stores*, 529 U.S. at 211. Secondary meaning is the

association created in the mind of the consumer between the trade dress and particular source. *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1214 (9th Cir. 2023). Secondary meaning can be established in a variety of ways, some of which also speak to inherent distinctiveness, including "direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; the amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *P & P Imps. Ltd. Liab. Co. v. Johnson Enters., Ltd. Liab. Co.*, 46 F.4th 953, 961 (9th Cir. 2022). A complaint need only show a combination of these factors to succeed on its claims. *Id*. "Whether a claimed mark has a secondary meaning is a question of fact to be determined by a jury." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 991 (9th Cir. 2006).

The Amended Complaint alleges that consumers have contacted Elemental through multiple channels to express confusion about whether Elemental was the source of Brunson's products[2] (Dkt. 8 at ¶¶ 71-72, 110), that Elemental used the trade dress exclusively prior to Brunson's alleged infringement (*id.* at ¶ 24), and that Brunson has intentionally mimicked Elemental's trade dress (*id.* at ¶¶ 54-55, 57, 66-68, 77-78, Ex. D).[3] Taken as true, these allegations

---

[2]     While this direct consumer testimony does not directly address whether or not Elemental's claimed marks have acquired a secondary meaning, it provides a substantial basis for the reasonable inference that consumers had come to associate Elemental's packaging and other claimed marks and symbols with the belief that a particular product was sourced from Elemental, i.e., a secondary meaning.

[3]     Elemental also lists several items that it claims satisfy the other secondary meaning factors (Dkt. 15 at 9), however, the facts that Elemental presents as satisfying these factors are not always capable of doing so. For example, Elemental claims that paragraph 17 of the Amended Complaint demonstrates an extensive use of the trade dress in advertising (*id.*), but paragraph 17, especially in the context of its surrounding paragraphs, only alleges that the logo and word mark were extensively used in advertising—not the trade dress (Dkt. 8 at ¶¶ 17-20).

would permit a reasonable jury to find that Elemental's packaging had obtained a secondary meaning in the mind of consumers. Accordingly, the Amended Complaint contains sufficient allegations that Elemental's claimed trade dress is source identifying.

### b. Likelihood of Consumer Confusion

To properly allege an infringement of trade dress, the Amended Complaint must sufficiently allege that the Brunson's infringement create a likelihood of confusion between the pertinent products. *Clicks Billiards*, 251 F.3d at 1258. For this analysis, the Ninth Circuit considers the *Sleekcraft* factors. *Jason Scott*, 68 F.4th at 1218. The *Sleekcraft* factor test requires an assessment of (1) strength of mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Jason Scott*, 68 F.4th at 1218 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003)). This test is a pliant one, and the relative importance of each factor will be case-specific. *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). While some factors may always be important, it is frequently sufficient to reach a conclusion on the matter of the likelihood of consumer confusion with only a subset of factors. *Id*.

Importantly, however, evaluating the likelihood of consumer confusion is a fact-intensive analysis that is not suited to motions to dismiss, but rather, such a "fact-specific inquiry [is] best left for decision after discovery." *Mastro's Restaurants LLC v. Dominick Grp. LLC*, No. CV 11-1996-PHX-PGR, 2012 WL 2091535, at *5-*6 (D. Ariz. June 11, 2012) (quoting *Vulcan Golf, LLC*

*v. Google Inc.*, 552 F. Supp. 2d 752, 769 (N.D. Ill. 2008)). "Whether defendants' uses . . . create a likelihood of confusion, are fact-specific issues not properly resolved through a motion to dismiss." *Gov't Emps. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 704 (E.D. Va. 2004).

      While recognizing that the intent to confuse consumers is not a requisite element, "intent to deceive is strong evidence of a likelihood of confusion." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002) (quoting *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999)). Where a purported infringer decides to use a mark knowing that the mark is similar to another, the reviewing court may infer an intent to confuse. *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993). And, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. Here, the Amended Complaint alleges that Brunson had sold Elemental's products with Elemental's packaging for several years (Dkt. 8 at ¶¶ 28, 30-33, 46, 50); Brunson created his packaging to be nearly identical to Elemental's (*id.* at Ex. D); and Brunson made statements designed to confuse consumers (*id.* at ¶¶ 57, 66). These allegations, when taken as true, are sufficient to assert that Brunson had the intent to deceive and to create a presumption that a likelihood of consumer confusion exists.

      Moreover, *actual* consumer confusion is strong evidence for the likelihood of consumer confusion. *Off. Airline Guides*, 6 F.3d at 1393. Again, the Amended Complaint alleges that consumers have contacted Elemental through multiple channels expressing confusion about whether the products that Brunson was selling were affiliated with Elemental (Dkt. 8 at ¶¶ 71-72,

110). Elemental has alleged actual confusion that is sufficient to survive a motion to dismiss on this issue.

In summary, the Amended Complaint alleges facts sufficient to reasonably infer that Brunson intentionally copied Elemental's claimed trade dress. This inference entitles Elemental to a presumption that there is a likelihood of confusion. *Sleekcraft*, 599 F.2d at 354. Furthermore, the Amended Complaint alleges that Brunson's use of the claimed trade dress has created actual consumer confusion. Accordingly, the Court denies Brunson's motion to dismiss Count III.

  **4.**  **Counts IV and V: Violation of 15 U.S.C. § 1125(a) Trademark Infringement**

Elemental alleges that Brunson uses Elemental's claimed word mark and logo in his advertisements, on his products, and on his websites in violation of 15 U.S.C. §1125 (Dkt. 8 at ¶¶ 112-130). To prevail on a claim for trademark infringement, Elemental "must show that: (1) it has a valid, protectable trademark, and (2) that [Brunson]'s use of the mark is likely to cause confusion." *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007). Brunson did not initially challenge the second element.

    **a.**  **Valid and Protectable Trademark**

A plaintiff can establish a valid and protectable trademark by showing that it had a federally registered mark; its mark was descriptive and acquired a secondary meaning; or its mark was suggestive or otherwise inherently distinctive. *Id.* at 969-70. "Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998). "If a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, then the mark does not describe the product's features, but

suggests them. Such a mark is therefore classified as 'suggestive.'" *Id*. And again, "a mark has acquired distinctiveness . . . if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Wal-Mart Stores*, 529 U.S. at 211 (quoting *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 851 n.11 (1982)). The parties dispute whether the marks at issue are descriptive or suggestive (Dkt. 14 at 10-12; Dkt. 15 at 13-14), and if they are descriptive, whether the marks have acquired a second meaning (Dkt. 14 at 12-13; Dkt. 15 at 14-15).

While plaintiff bears the burden of pleading a prima facie case, whether a mark is distinctive is normally a question of fact, unsuited for determination on a motion to dismiss. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928-29 (9th Cir. 2005). The question of whether a mark is descriptive or suggestive is highly elusive and tends to weigh in favor of finding that the mark could reasonably be found suggestive or otherwise distinctive. *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1162 (9th Cir. 2021).

Descriptive marks are considered valid and protectible when they have acquired a secondary meaning, i.e., source identification. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014-15 (9th Cir. 1985). Here, the Amended Complaint alleges that consumers have contacted Elemental through multiple channels to express confusion about whether Elemental was the source of Brunson's products[4] (Dkt. 8 at ¶¶ 71-72, 110); Elemental used the word mark and logo exclusively prior to Brunson's alleged infringement (*id.* at ¶ 15); Elemental has used the word mark and logo since 2003 (*id.* at ¶¶ 10, 14, 113, 123); Elemental has used these marks

---

[4] *See* note 3.

extensively in its advertising (*id.* at ¶¶ 17-20); and Brunson has intentionally mimicked Elemental's marks (*id.* at ¶¶ 57, 60-61, 65-68, 75-78 Ex. D).

These allegations, if true, could permit a reasonable jury to find that Elemental's packaging had obtained a secondary meaning in the mind of consumers. A descriptive mark with a secondary meaning and a suggestive or inherently distinctive mark are both equally protectable. Accordingly, Elemental has alleged sufficient facts to establish that the claimed word mark and logo are protectable and valid, and at this time, this Court does not need to determine whether the pertinent marks are descriptive or suggestive.

### b. Likelihood of Consumer Confusion

Evaluating the likelihood of consumer confusion is a fact-intensive analysis that is not suited to motions to dismiss, but rather, such a "fact-specific inquiry [is] best left for decision after discovery." *Mastro's Restaurants*, 2012 WL 2091535 at *5-*6 (quoting *Vulcan Golf*, 552 F. Supp. 2d at 769). "Whether defendants' uses . . . create a likelihood of confusion, are fact-specific issues not properly resolved through a motion to dismiss." *Gov't Emps.*, 330 F. Supp. 2d at 704.

The intent to confuse consumers is not a requisite element, but "intent to deceive is strong evidence of a likelihood of confusion." *Entrepreneur Media*, 279 F.3d at 1148 (quoting *Interstellar Starship*, 184 F.3d at 1111). "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. Where a purported infringer decides to use a mark knowing that the mark is similar to another, the reviewing court may infer an intent to confuse. *Off. Airline Guides*, 6 F.3d at 1394.

The Amended Complaint alleges that Brunson sold Elemental's products with Elemental's packaging, which displays the pertinent logo and word mark, for several years (Dkt. 8 at ¶¶ 28, 30-33, 46, 50); Brunson continued to use Elemental's claimed word mark and logo in advertising after the termination of the Distribution Agreement (*id.* at ¶¶ 60-61, 64, 74); after Elemental made a new product line, Brunson made a new, almost identical product line with notably similar labels (*id.* at ¶¶ 77-78), and Brunson made statements that should be reasonably expected to confuse consumers (*id.* at ¶¶ 57, 66, 68). These allegations are sufficient to reasonably conclude Brunson had the intent to deceive and create a presumption that there exists a likelihood of consumer confusion. Accordingly, the Court denies Brunson's motion to dismiss Counts IV and V.

### 5. Counts VI and VII: 15 U.S.C. § 1125(a)(1)(A) False Affiliation and False Designation of Origin

Brunson moves to dismiss Count VI, false affiliation, and Count VII, false designation of origin, for failure to plead with particularity under Rule 9(b) of the Federal Rules of Civil Procedure (Dkt. 14 at 13-14).[5] The Ninth Circuit has not decided whether Rule 9(b) should apply to claims brought under 15 U.S.C. § 1125(a); some district courts in this circuit, however, have applied the Rule 9(b) requirements to such claims where the plaintiff alleges that the defendant "affirmatively misled customers." *See, e.g.*, *Santander Consumer USA Inc. v. drive.car LLC*, No. 3:23-cv-00288-SLG, 2024 WL 4880668, at *7 (D. Alaska Nov. 25, 2024); *Woodway USA, Inc. v. LifeCORE Fitness, LLC*, No. 24-cv-1936-AGS-AHG, 2025 WL 1490301, at *2 (S.D. Cal.

---

[5] Brunson alternatively argues that he is not liable under Counts VI and VII because he was entitled to put "descriptive words and symbols" on his products (Dkt. 14 at 14). This argument, however, does not relate to the statements he has made on his websites or his communications with customers which is the alleged misconduct for these causes of action (Dkt. 8 at ¶¶ 136-138, 152-154).

May 23, 2025); *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 634 (N.D. Cal. 2019); *23andMe, Inc. v. Ancestry.com DNA, LLC*, 356 F. Supp. 3d 889 (N.D. Cal. 2018).

Here, Elemental's claims rest on Brunson's affirmative acts and statements (Dkt. 8 at ¶¶ 138-140, 151-156). Accordingly, the Court assumes the 9(b) pleading requirements apply to Elemental's false affiliation and false designation of origin claims. Rule 9(b) requires that claims of fraud must allege the "who, what, when, where, and how" of the alleged misconduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Elemental's claims are rooted in the same facts and analyzed together. Elemental alleges that Brunson (who) (Dkt. 8 at ¶¶ 136-142, 152-158), starting in January of 2023 (when) (*id.* at ¶¶ 136, 152), on his website, in his packaging, and in communications with inquiring customers (where) (*id.* at ¶¶ 56-57, 65-66, 75-78, 135-139, 151-155), made statements and engaged in specific practices (how) (*id.*) that deceived customers into the belief that his products were associated with or originated from Elemental (what)[6] (*id.* at ¶¶ 57-59, 65-70, 140, 156). Elemental claims that these statements and actions repeatedly indicated that there was no change in the products (*id.* at ¶¶ 57-59, 66-70, 156), or that the products were in some way still associated with Elemental[7] (*id.* at ¶¶ 64-65, 75-76, 138, 140-141). Elemental further alleges that the products had

---

[6] In Brunson's motion to dismiss, he argues that Elemental has not established the "what" required by Rule 9(b) because Elemental does not allege the specific products in question. (Dkt. 14 at 14). Rule 9(b) does not require the plaintiff to describe what products the defendant sells that display or are described by fraudulent statements, but rather, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106.

[7] Whether Elemental has successfully alleged that Brunson has created a false affiliation is not dispositive, as false designation of origin and false affiliation are two alternative ways of showing the same element of the actual cause of action: false association. *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1108 (9th Cir. 1992), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static*

been changed because they were not sourced from Elemental (*id.* at ¶¶ 50-52, 56) and because Brunson stated that one of his websites was associated with Elemental (*id.* at ¶¶ 36, 62, 65, 134, 138).

Applying Rule 9(b)'s pleading requirements, Elemental has pled sufficient facts to meet the heightened standards for claims sounding in fraud, and the Court denies Brunson's motion to dismiss Counts VI and VII.

### 6. Count VIII: 15 U.S.C. § 1125(a)(1)(A) Cyberpiracy

Finally, Brunson argues that Elemental has not pled sufficient facts to establish a valid claim of Cyberpiracy because the phrase "Angstrom Minerals" is descriptive and, therefore, is not protectible (Dkt. 14 at 10-13). This Court analyzed this argument when considering Brunson's arguments concerning Counts IV and V and concluded Elemental has alleged sufficient facts to show a reasonable juror could conclude that the phrase "Angstrom Minerals" has acquired a secondary meaning and is protectable. Accordingly, the Court denies Brunson's motion to dismiss Count VIII.

**IT IS ORDERED that:**

1. Defendant Brunson's Motion to Dismiss (Dkt. 14) is **DENIED**.

2. Plaintiff Elemental Research, Inc.'s Motion to Strike (Dkt. 17) is **GRANTED**.

DATED: September 02, 2025

Amanda K. Brailsford
U.S. District Court Judge

---

*Control Components, Inc.*, 572 U.S. 118 (2014). This is also clear from the pertinent statute itself. 15 U.S.C. § 1125(a)(1)(A).